## U. S. Fire Apparatus Company,

### *vs.*

## G. W. Baker Machine Company.

### *New Castle, March* 30, 1915.

Where a corporation owned a patent, and the sole inducement for the purchase of its stock by another corporation was to obtain control of such patent, the buying corporation could have specific performance of the contract for the sale of stock against the seller, since the equitable doctrine of specific performance applies to contracts for the sale of personalty having a unique value, and not generally dealt in on the market, so that money damages will not afford a certain and adequate remedy at law.

The rule respecting the specific enforcement of contracts for the sale of land is that the seller has the same right against the buyer as the buyer has against him.

Specific performance of the sale of property other than land will not be granted to the seller, where his only relief is the recovery of money based on the purchase price, since in such case the remedy at law by suit therefor is adequate.

Where stock in a corporation doing no business, but controlling a patent, was sold merely so that the buyer might secure such patent, the seller could have specific performance of the contract of sale, his remedy at law for money damages being inadequate, since in their ascertainment the value of the stock, which depended upon the value of the patent, was a necessary factor and uncertain.

In the seller's action for breach of a contract to buy corporate stock, the measure of damages is the difference in the market value of the property at the time of the breach and the price fixed by the contract.

Where a corporation contracted to buy stock in another company solely for the purpose of controlling a patent owned by such other company, it was not a ground for relief in the seller's suit for specific performance that the buyer had acquired knowledge of the patent through a voluntary inspection, such that any seller would give, and any buyer require, before the sale.

The directors of a corporation must act officially as a board, not as individuals, and neither a quorum nor a majority can act regularly, except through a duly convened meeting; their individual assents to a contract except in meeting, not being an assent of the board.

Where one contracted without authority on the behalf of a corporation to sell certain stock, and the corporation ratified the contract by delivering to the buyer books, etc., of the stock of the corporation which was sold, and also by bringing suit to secure its specific performance on the buyer's refusal to take and pay for the stock, there was such a ratification of the agent's unauthorized contract as to justify its enforcement in the specific performance suit.

Where a corporation contracted to sell stock in a third company, entering into a guaranty against any indebtedness of such company, in its suit for specific performance of such contract against the buyer, a decree of specific performance would require performance of the guaranty, and also cancellation of any indebtedness from the company, the stock of which was sold, to the seller.

Where defendant contracted to buy stock in a corporation doing no business, and whose only property was a patent which it was the sole object of defendant to secure, there having been full opportunity for

inspection and examination of the validity of such patent, and no misrepresentation, the fact that a third party threatened to institute suit for infringement and for an accounting against the corporation for two machines already built under the patent gave no right to the purchaser to rescind the contract.

Bill for Specific Performance.  The bill is one for the specific performance of a contract to buy shares of stock of a corporation.  The complainant owns 1,800 shares of the Diamond Manufacturing Company, being sixty per cent. of the outstanding capital stock, and the Diamond Manufacturing Company owns, by assignment from William J. Jones, certain claims to a patent for a certain machine for treating leather.  By the bill the complainant claims that the defendant agreed to purchase from it these shares of stock in order to control the company owning the claims for patents, and submits as proving the purchase two letters from the defendant company addressed to one James J. English.  It alleges that he was acting for the complainant, being its secretary, treasurer and general manager, though the name of the complainant is not mentioned in the letters, both of which were dated October 9, 1913; that before and after the contract was made, the claims were submitted by the complainant to examination by the defendant, and thereby the defendant gained full knowledge of the patent; that afterwards, on October 14, 1913, the defendant repudiated the contract, and refused to perform it, though the complainant was able to perform and offered to do so.  The prayer for specific performance is based on inadequacy of a remedy at law, first, because a judgment in a suit at law would not place the complainant, with respect to the patents, in the same position in which it was prior to the contract, the defendant having knowledge of the machine and its patent status; and, second, because there was no means to determine the market value of the stock of the Diamond Manufacturing Company, that value "being almost entirely dependent on the commercial value of said patent claims," and that the damages for a breach of the contract "would of necessity be a matter of mere conjecture."

The two letters are as follows:

Statement of the case.

"October 9, 1913.

"Jas. J. English, City—Dear Sir: Mr. Wm. J. Jones has submitted to us your offer to sell us 1800 shares of the capital stock of the Diamond Manufacturing Company, a corporation of the State of Delaware. The price seems to us high, considering the limited claims that Mr. Jones is going to be able to secure on his machine. However, we will buy these shares with the understanding that there has so far been issued only 3,000 shares of the stock of this company, and that you guarantee the company to be free of all indebtedness. With this purchase of stock we are to receive all books of the company, all drawings, patterns and templates pertaining to the building of the Jones seasoning machine, as well as the machine now at the Delaware Leather Company's, and the first machine built. For this we agree to pay you the sum of $5,000, as follows: In cash, $500.00; 3 notes, $1,500.00 each, at two, four and six months. Settlement to be made as soon as our attorney can examine papers in the matter, and have agreements drawn between Mr. Jones and ourselves.

"Trusting the above will meet with your approval, we beg to remain
"Very truly yours,
"G. W. Baker Machine Co.
"Geo. W. Baker, President."

"Oct. 9, 1913.

"James J. English, Esq., City—Dear Sir: Mr. Jones has reported to us your talk with him and we accept the offer of $5,280.00 as the price, the payments to be:

| | |
|---|---|
| Cash.............................. | $  780.00 |
| Note 2 months...................... | 1,500.00 |
| Note 4 months...................... | 1,500.00 |
| Note 6 months...................... | 1,500.00—$5,280.00 |

"Kindly have all papers, charter and such sent to the office of William S. Hilles, our attorney, and as soon as he has passed on same we will make settlement.

"Yours very truly,
Geo. W. Baker, Pres."

The answer denies that any of the claims of the Jones patent have been allowed and says the defendant's contract was with English and not with the complainant company, and that the defendant was seeking a controlling interest in the Diamond Manufacturing Company. It is further claimed, that neither English, nor the complainant, did or could perform the contract by delivery, or offering to deliver, the books

of the Diamond Manufacturing Company, the drawings, etc., for the machine.and the two machines already in existence. Certain books had been turned over to counsel for the purchaser, and pending his examination thereof the defendant received from counsel for F. F. Slocomb & Co. a notice dated October 14, 1913, that the machines made under the Jones claims were infringements. Immediately on receiving this notice it was brought to the attention of English, and on October 20th he was notified by the defendant that because of the threatened suit it would not go further, and withdrew its offer. It is denied that the defendant has acquired any knowledge of the patent and machines which affected the rights of the complainant. The jurisdiction of the court to compel specific performance was denied. It was alleged also that if the claim of infringement be sustained the stock of the Diamond Manufacturing Company is worthless, and that it is, in fact, absolutely worthless.

The letter from the defendant to English, dated October 20, 1913, stated that the defendant had been notified that the Jones invention was an infringement on other patents, and that suit would be instituted to determine this question and for an accounting for the machines already built, and then contained this statement:

"Under the circumstances, it is impossible for us to go further in the matter, in view of the fact that the company was to be turned over to us free of obligations. We therefore must decline to proceed further, and to withdraw our offer as it was conditioned upon our being satisfied that the Diamond Manufacturing Company was clear from any indebtedness or obligations other than those of which were familiar."

The further facts, not disputed, were these: The Jones claims for a patent had been assigned to the Diamond Manufacturing Company in exchange for all the capital stock of 3,000 shares, except the shares necessary to qualify officers. It was created to hold the patents and had no other asset, and did no business. Of its shares 1,200 were held by Jones, 1,794 by the complainant, and the remaining 6 by certain directors, and all but those held by Jones were held for the U. S. Fire

Apparatus Company, the complainant. The negotiations for the sale of the shares of stock were between Jones and the defendant, except preliminary inquiries made of Mr. English by Edward B. Mode, its vice-president.

It was disputed, however, that the machine made according to the Jones patent and which the Delaware Leather Company at one time had in its possession was there on trial, and so under control of the complainant, or whether it had been sold.

The case was heard on bill, answer, exhibits and testimony taken by depositions before an examiner.

*Charles F. Curley*, for the complainant.
*William S. Hilles*, for the defendant.

The Chancellor. This being a bill filed by a vendor to enforce specific performance by the vendee of an agreement for the sale of shares of stock of a corporation, the jurisdictional question must first be considered. In this State, in two reported cases, the power and duty of the Chancellor to decree specific performance of agreements concerning property other than real estate was considered. The first one, *Satterthwait v. Marshall*, 4 *Del. Ch.* 337, 349, was a bill to compel an assignment of a patent. There Chancellor Bates explicitly asserted the power to grant the relief, the inadequacy of money damages at law being the jurisdictional test, and used these words:

"Whenever, from the nature of the chattel interest contracted for, or from any circumstances a sufficiently certain and adequate redress cannot be afforded by a suit at law, a court of equity will relieve without respect to the question whether the subject-matter of the contract is real or personal estate."

In the other case, *Diamond State Iron Co. v. Todd*, 6 *Del. Ch.* 163, 14 *Atl.* 27, affirmed without an opinion in 8 *Houst.* 372, 14 *Atl.* 27, Chancellor Saulsbury refused to order a vendor to specifically perform an agreement to sell shares of stock of a private manufacturing company, not because the subject-matter was shares of stock, but because the contract was

uncertain, unfair and inequitable. Indeed, the Chancellor recognized that the remedy was not limited to agreements concerning land, and was applicable where the complainant had a special reason for desiring to acquire the particular property sold, and stated the test to be that "legal damages might be too uncertain and conjectural to constitute an adequate compensation." He referred to the argument of the vendee, the complainant, that the absence of a market value gave jurisdiction, and without affirming or denying the principle the Chancellor refused to apply it in the case before him, because, as he said, the value of the shares could have been proved in that case.

These decisions indicate that if the inadequacy of legal remedy exist because the money damages to be given in a suit at law cannot be calculated with sufficient certainty, or it be impossible or impracticable to ascertain them, a court of equity will give relief by requiring performance according to the agreement under consideration in this case. It is true that both of these cases were brought to obtain specific property, in the one case the particular patent, and in the other the particular shares of stock; but as stated hereinafter, the remedy would be equally available for the assignor and the vendor in like case.

It is now well established by decisions elsewhere that a court of equity will under some circumstances decree specific performance of contracts for the sale of shares of stock of corporations, and the rule is thus stated in *Cook on Corporations*, §338:

"If the stock contracted to be sold is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted to be delivered, a court of equity will decree a specific performance, and compel the vendor to deliver the stock."

See, also, 2 *Pomeroy on Equitable Remedies*, §452, and

note of cases in 12 *L. R. A.* 776; 50 *L. R. A.* 501; 31 *L. R. A.* (*N. S.*) 496, where many cases are cited.

In the present case the defendant, the vendee, would have been entitled to a decree of specific performance against the complainant, the vendor, if there had been a valid contract between them for the sale of the shares of stock in question. Here the buyer purchased a majority of the shares of stock of a corporation solely because that corporation owned a certain claim to a patent and the object of such ownership was admittedly the control of the patent. There was, then, a particular and reasonable cause why the vendee required a delivery of the stock of that company rather than that of any other company; or even than money damages if they could have been adequately ascertained.

It is urged by the complainant that inasmuch as the vendee could have specifically enforced the contract in this case, the vendor should be given the same right as against the vendee. It is true that this rule is applied respecting contracts for the sale of land. Pomeroy thus stated the rule:

"Where an equitable remedial right in the vendee is recognized, a corresponding remedial right should be admitted to the vendor." 2 *Pomeroy on Equitable Remedies*, §747.

But it is not to be assumed that it will be applied to contracts of sale of property other than land where the relief obtained is only the recovery of money based on the purchase price. There are cases which hold that as applied to sales other than of real estate, the foregoing rule stated by Pomeroy should not be applied. In *Eckstein v. Downing*, 64 *N. H.* 248, 9 *Atl.* 626, 10 *Am. St. Rep.* 404, where there was a contract by the complainant to exchange his yacht for a certain number of shares of stock owned by the defendant in a corporation, and the value of each article in the exchange was ascertainable, the court refused specific performance. The value of both articles was proved. The court therefore refused specific performance, saying:

"When payment is to be made in money, mutuality  *  *  * is not

the test for the right to this remedy; and when the exchange on one side differs neither in purpose nor reason from a sale for money, the remedy of specific performance need not be mutual. The mutuality required is that which is necessary for creating a contract enforceable on both sides in some manner, * * * but not necessarily enforceable on both sides by specific performance."

See, also, *Jones v. Newhall*, 115 *Mass.* 244, 15 *Am. Rep.* 97, and *Hissam v. Parish*, 41 *W. Va.* 686, 24 *S. E.* 600, 56 *Am. St. Rep.* 892, which hold that equity will not decree specific performance of a written contract of sale of an interest in certain corporations at the instance of the vendor when all that is to be done by the vendee is the payment of money, for which the vendor may maintain an action at law after a tender of performance.

Two cases were cited by the complainant to establish the application of the principle of mutuality: *Bumgardner v. Leavitt*, 35 *W. Va.* 194, 13 *S. E.* 67, 12 *L. R. A.* 776, and *McCullough v. Sutherland*, 153 *Fed.* 418. The former case is inconsistent with the later case in West Virginia, cited above, though not referred to in it, and the federal case does not apply.

Chancellor Saulsbury in *Todd v. Diamond State Iron Co.*, 8 *Houst.* 372, 387, 14 *Atl.* 27, 35, in referring to specific performance of contracts relating to property other than real estate, said:

"And, since the remedy must be mutual, the vendor may also maintain the action in such cases."

But this is not to be taken to mean that because a buyer of personal property is entitled to have specifically the thing he bargained for, the seller should be given a remedy in equity which he could have obtained as well in a court of law, viz., money damages based on the contract price.

In this case under consideration, the defendant, the vendee, could have obtained specific performance of the agreement and a decree that the particular shares be transferred to it, provided, of course, the other jurisdictional elements were present. Here the buyer purchased a majority of the shares

of stock of a corporation solely because that corporation owned a certain patent, and the object of such ownership was admittedly the control of the patent by the purchaser.  These shares and this control could not have been acquired otherwise. That this gives ground for equitable relief to a vendee is beyond question, and is recognized in the Delaware cases, and is in fact the basis of the rule respecting real estate.  There is, then, in this case no valid objection to the exercise of the jurisdiction based on the character of the property sold.

There is, also, in this case a sufficient reason for sustaining the jurisdiction of the court where the seller and not the buyer seeks specific performance, viz., the inadequacy of the legal remedy, for it is clear that the money damages which would be there awarded could not be ascertained with reasonable certainty.  The measure of damages which the complainant could recover in his action at law for the breach of the contract to take and pay for the shares of stock is the difference in the market value of the property at the time of the breach, and the price fixed by the contract.  It appears clear by proof adduced, and from the inherent probabilities of the case, that there is no market value and no means of ascertaining with reasonable certainty the value thereof; and, therefore, the vendor is entitled to a decree requiring the purchaser to pay the contract price.  No valid objection exists, then, to the jurisdiction of the court to decree specific performance based on the character of the property, or on the fact that the complainant is a vendor and not a buyer.

It is not, however, a ground for relief, as claimed by the complainant, that the defendant has acquired knowledge of the patents.  The inspection was granted voluntarily, was such as any seller would give and any buyer require, and was given before October 9, 1913.  Besides, the information was probably acquired otherwise than through the defendant.

There are, however, other questions to be decided.  What right has the complainant to enforce the contract made apparently with English?  The two letters of October 9, 1913, were addressed to English, and purported to accept an offer made by English through Jones to the defendant.  It is claimed that

English was acting for the complainant company, being its secretary, treasurer and general manager, and that this was known to and understood by Mode, who conducted the negotiations on the part of the defendant as to the purchase of the stock. There is a dispute as to this point in the testimony. But the weight of the testimony sustains the view of the complainant. The delivery of the two machines already made, or being made, was a part of the contract, and perhaps an important part of it; and as it was known that these were made by or for the complainant, and not English, there is in the contract itself some evidence to support the complainant's contention as to a disclosed principal. The complainant, therefore, was a proper party to enforce the contract made for it by its agent or representative.

There is also sufficient evidence of the authority of English to make the contract for the company he represented. True, there was no meeting of the directors of the selling company at which the sale was either considered or authorized, and no formal resolution was adopted. The directors of a corporation act as a board and not as individuals. Neither a quorum, nor a majority, can act regularly in any other way than through a duly convened meeting, and their individual and several assent to a contract without a duly convened meeting is not the assent of the board, and would be irregular. 2 *Machen on Corporations*, §1463. It is urged, however, that if not merely a majority but all of the directors assent to some contract, or proceeding, it would seem on principle to be immaterial that their assents were given separately and not at a board meeting. This is the view expressed in 1 *Machen on Corporations*, §1465, and authorities are there cited to support it, though he notes other cases which take a different view. It is not necessary in this case to agree with the learned author in order to reach a conclusion here. Even if originally there was no authority in English to sell the shares of the complainant company, as to which no opinion is expressed, the acts done in ratification of the contract and the bringing of the suit to enforce performance of it constitute such an adoption of the agreement by English for the company, that the court

is justified in enforcing it, the other grounds for doing so being shown.

Is the complainant able to fully perform its part of the contract? In addition to selling the shares of stock, it was the duty of the seller to deliver the two machines, and it sufficiently appears that they were under the control of them so that they could have been delivered, and it is shown that they are now in the possession of the complainant. The same is true of the books and other articles mentioned in the letter.

The complainant, as the disclosed principal in a contract made by its agent, may perform the provision as to a guaranty against any indebtedness of the Diamond Manufacturing Company, meaning thereby, of course, a guaranty that there are no debts due from the Diamond Manufacturing Company. This will be one of the things which the complainant may be required by a decree to do as a condition for the payment by the defendant to it of the purchase price for the shares of stock. In addition thereto, a further term may be imposed in the decree that the complainants cancel and discharge the indebtedness, or appearance of indebtedness, of the Diamond Manufacturing Company to it.

The other defenses relate to the worthlessness of the patent, and the defendant distinctly based its right to rescind the contract solely because of the threat of the Slocomb Company to institute a suit for an infringement and for an accounting for the two machines already built. It is a sufficient answer to both contentions, that the president of the defendant company before October 9, 1913, had examined the Jones machine and had been shown the Jones claims to a patent, and that they had been fully explained to him. Also the president of the defendant company was familiar with the Slocomb patents and fully considered them, and was sufficiently experienced to know the effect of one patent on the other. Besides, there was no deception, concealment or misrepresentation by the seller, and the buyer had full opportunities to examine and investigate the validity of the Jones and Slocomb patents, but did not choose to submit them to an expert for consideration. Under the circumstances it would

not be inequitable to require the defendant to perform its contract, even if the subject matter of it had been the Jones machine, or the Jones patent. Of course, the contract related to shares of stock and not to patents, or machines; but it was clearly in the minds of both parties that the stock was wanted for one reason only, viz., to control the claim for a patent on the Jones machine, so that it was in effect an agreement concerning a patent. It is true, as urged by the defendant, a court of equity will not compel a purchaser to buy a lawsuit. But here there is no evidence respecting the validity or invalidity of the Jones claim to the patent, or its value. There is nothing but a notice from the Slocomb Company, the maker of a rival machine, the existence and character of which were known to the defendant, that the Jones claim was an infringement on the Slocomb patent, and a threat or warning as to the consequences of selling the infringing machine. There was no guaranty of the Jones claims. The fear that the Jones patent was not worth what on investigation the defendant thought it was worth to it, is not sufficient to excuse performance by the defendant, and neither is the notice from the Slocomb Company of a claim of infringement.

The conclusion is that the complainant is entitled to a decree requiring the defendant to accept a certificate for eighteen hundred shares of the Diamond Manufacturing Company and pay to the complainant the sum of $5,280, the time for the payments of the installments, as stated in the contract, having expired, and that before being required to do so the complainant shall deliver to the defendant its guaranty against all indebtedness due from the Diamond Manufacturing Company, and a full acquittance of all claims against the Diamond Manufacturing Company, and deliver to the defendant the books, machines and other matters mentioned in the letters of October 9, 1913. The costs will be on the defendant.

In accordance with the foregoing opinion, the following decree was entered:

"And now, to wit, this 7th day of April, A. D. 1915, this cause having come on to be heard upon bill and answer, exhibits and testimony taken

434 IN RE D. ROSS AND SON, INC.

by an examiner, and the cause having been argued by the solicitors for the respective parties, and fully and maturely considered by the Chancellor, and it appearing to the Chancellor that the complainant is entitled to a decree requiring the defendant to accept certificates for eighteen hundred (1,800) shares of the stock of the said Diamond Manufacturing Company and to pay to the complainant the sum of fifty-two hundred and eighty dollars ($5,280.00), upon receiving from the complainant its guaranty against all indebtedness of the Diamond Manufacturing Company and a full acquittance of any claims held by it against the said Diamond Manufacturing Company, and also the machinery and other things mentioned in the said letters of October 9th, 1913,

"It is, therefore, ordered, adjudged and decreed that the said defendant, within thirty days from the date hereof, accept from the complainant certificate or certificates for eighteen hundred (1,800) shares of stock of the said Diamond Manufacturing Company, and all books of the said Diamond Manufacturing Company, and all drawings, patterns and templates pertaining to the building of the Jones seasoning machine, and the two machines owned by the said Diamond Manufacturing Company mentioned in the said contract, and that at the time of the delivery of the above the complainant shall also deliver to the said defendant its guaranty against all indebtedness of the said Diamond Manufacturing Company, and also a full acquittance of all claims held by it against the said Diamond Manufacturing Company, and that thereupon the said defendant shall pay to the said complainant the sum of fifty-two hundred and eighty dollars ($5,280.00).

"And it is further ordered, adjudged and decreed that the costs in this case, which are hereby taxed at the sum of one hundred and thirty-eight dollars and thirty-seven cents be paid by the said defendant within thirty days from the date hereof."

On appeal the decree was reversed by the Supreme Court, See 11 *Del. Ch.*, 97 *Atl.* 613.